ISABEL HOOPER

*v.*

EDWARD HOOPER.

EDWARD HOOPER

*v.*

ISABEL HOOPER.

Although a wife leaves her husband's house through his fault, yet if he afterwards sincerely solicits her to return and she deliberately and persistently refuses to do so, her conduct constitutes desertion within the meaning of the divorce act.

Bills for divorce *a vinculo* for desertion

*Mr. Chas. Haight,* for Isabel Hooper.

*Mr. C. Robbins,* for Edward Hooper

THE CHANCELLOR.

These are counter-suits for divorce for desertion. The parties were married in 1857, in this state. They resided here then, and have lived here ever since: They lived together from the time of the marriage up to 1865, on a farm belonging to the husband's mother, in Monmouth county, and had one child. On the 7th of October, in that year, in the evening, Mrs. Hooper left her husband's house, and never afterwards returned to him. She alleges that the occasion of her going was that he ordered her out of the house, saying that she should not stay there another night, and threatened to kill her if she did not go away. It appears that he had been away from home at Red Bank, and

Hooper *v.* Hooper.

on returning, found that no supper had been prepared for him, but his wife, who was a dress-maker, was engaged in making a dress for a customer. He seems to have become angry at this want of attention to his comfort and to have scolded her. He denies that he threatened to kill her or menaced her with any violence. She went out of the house with the dress and her lamp in her hand, taking with her her child, and went into another room of the house, occupied by a tenant of her husband. Hooper followed her out of the house, and according to the tenant's testimony, he said as she went into the tenant's room, "Yes, you can go in there and stay, but you will never come in here again." She finished her work in the tenant's room, and while there a messenger came from a neighbor, Mrs. Roberts, with a request that she would come to the latter's house the next day and take charge of it during the absence of the family at a funeral. She at once consented, saying she would go immediately, and then went into her own part of the house and made the necessary preparations, and without saying anything to her husband, who was there, left, never again to return to live with him. The next day she returned to her own house for clothes, which she obtained, and went back again to the house of Mrs. Roberts. She remained there for more than a week, and then went from there to her father's house.

She alleges that while for about three years after the marriage, her husband treated her well, after that time he was harsh and tyrannical towards her, neglected her in sickness, denied her the necessaries of life, was abusive in language to her, and even struck her. He denies all this. Her complaint as to want of necessary food and fuel appears, from the proof, to be entirely unfounded, and so, too, does her charge that her husband neglected her at the time of her confinement; and there is just reason to believe from the evidence that her representation of his treatment of her in other respects, is at least greatly exaggerated. The evidence conclusively shows a very earnest effort on his part to induce her to return to him, and a very decided refusal on her part. He swears that when she left he did not know that she did not intend to return, and that he did not consent to her going; that

the first intimation he had that she did not intend to return was from Mrs. Roberts, to whose house she went, from whom he learned it three or four days after she left. About two weeks after she left him he saw her at her father's house, where he went with Mr. Harris, the pastor of the church of which they were both members, to induce her to return. She then agreed to do so, and promised to write to him, informing him when he should come for her to take her home. The next day or two days afterwards she wrote him a letter dated October 20th, in which she addressed him affectionately, and said that she had consulted with her parents, and had concluded to return to him, and that she had not fully regained her confidence in him, but would trust the future to prove his faithfulness and truthfulness; that she wished him to go to Mrs. Roberts and Mrs. Sears, two of her neighbors, before coming for her, and tell them the whole truth; that they had been her firm and fast friends, and that by his taking that course they would regard him in a new light; and that after that he might come for her when it suited his convenience. He received this letter through the post-office in the evening and the next morning went with his covered carriage to her father's house for her. When he arrived there she was not at home. He waited for her all day, but she did not return, and he went home again. An evening or two after that, he received another letter from her, dated October 22d, in which, addressing him most formally, she said that upon considering the past, she had thought best to take legal advice, and had concluded that she would never return to him. On receipt of this letter, which he got from the post-office in the evening, he set out on foot for her father's house, and walked the entire distance of about seven miles and a half, reaching the house at about eleven o'clock at night. He saw her. She merely asked him what he was doing up there at that time of night, and declined to talk further with him, but took their child, which was asleep, and started to go up stairs with it. He begged her to let him see the child, but she would not stop, and he then asked her if she would not give him a lock of its hair. She carried the child away up stairs and would have no interview with him, and he soon afterwards left the house

and went home again.  She never returned to his house again, except on two occasions, one, he says, about one year and the other about two years after that time, and on both occasions she merely came to get her clothes and furniture, which, however, he refused to permit her to take, because, as he says, he thought that by permitting her to take them he would be held to have consented to her living separate from him.  From the time when she left his house she has supported herself, and she has never had any communication with him, except in her efforts to get her clothes and furniture, and though the child became sick and died, she did not inform him either of its sickness or death.  It is a notable circumstance, that in the interview before mentioned, at which Mr. Harris, their pastor, was present, she did not complain that her husband had treated her with cruelty or express any apprehension of bodily harm if she were to return to him, but gave as her reason that she was discontented and could live more to her liking away from him.  Mr. Harris says:

"Her reasons were that 'they were isolated where they lived,' that 'she had no society;' that 'she wanted to live better than they did there, as to dress, appearances,' &c.—that was about the sum and substance of it; she did not refer to violence to her or fear on her part, of her husband; in a general way as to unkind treatment of which she spoke, as I have said, she said 'that her husband did not get everything she wanted, and was sometimes peevish and cold, and denied her some things,' but by unkind treatment I did not mean, nor did she speak of anything by way of force or violence; the burden of her complaint was that she expected to live better and appear in society, and was discontented in not realizing these things, and could do better at her father's; when she spoke of not being properly provided for, it was in the way I have just mentioned."

And when, some weeks afterwards, a committee of the church, to which she had made application for a letter of dismission, called on her on the subject and talked with her as to her relations to her husband, she gave only the like reason for her refusal to live with him.  Her friend, Mrs. Roberts, one of the neighbors mentioned in her letter of October 20th to her husband, and the person to whose house she went when she left her husband (and she staid there over a week before she went to her

father's house) says that she never complained to her of her husband's treatment, but only that, as the witness expresses it, " she did not have the necessaries on the table she would like to have."

It is not at all improbable that the disparity between their ages (she was then twenty-five and he forty-six), and the difference in their tastes and dispositions, were the occasion, to a great extent, at least, of her discontent.

The wife relies for a decree in her favor on the principle that when a husband treats his wife with such cruelty or violence that she is obliged to leave him for safety or to avoid personal injury, such compulsory flight amounts to a desertion by him; and if he does not seek her and try to persuade her to return, with promises of amendment, such absence, if continued for the requisite time, is a willful and obstinate desertion on his part. *Laing* v. *Laing, 6 C. E. Gr. 248; Palmer* v. *Palmer, 7 C. E. Gr. 88.* By her bill, her claim to a divorce is based on the allegation that previously to October her husband had treated her with cruelty, and on that day drove her from the house, and refused to permit her to return to it, and that he has never since offered her a home or made any provision for her wants. The last branch of this allegation is not only not sustained, but is positively disproved. The evidence establishes the fact that, very soon after she left her husband's house, he took measures, as before mentioned, to induce her to return, and it not only appears that he was sincere in his efforts and anxious to have her return, but that he was greatly distressed at her refusal. His conduct on receiving her letter refusing to return is abundant evidence of his sincerity. He received it in the evening, and, as before stated, at once set out on foot for her father's house, a distance of about seven miles and a half, through a storm. The next morning he went to the house of Mr. Harris with the letter, and showed and read it to him. Mr. Harris says that Hooper was very nervous and very much affected by the disappointment; that tears ran down his cheeks and he trembled. The committee of the church endeavored to induce her to return to her husband, but she refused. She says in the letter in which she refused to return, that she did so through legal advice, but she admits that

that was untrue; that she had not, in fact, taken any legal advice. It was clearly her duty to return to her husband under the circumstances, when he solicited her to come back to him. She deliberately determined, however, that she would never return, and for fifteen years before she filed her bill she had kept her determination. From the time when she refused to return, she deserted him.

Her bill will be dismissed, and a divorce will be decreed to him.